WAYNE WORKS *v.* HICKS BODY COMPANY, INC.

[No. 17,198. Filed June 15, 1944.]

11

*Brown, Reller & Mendenhall,* of Richmond, and *O. B. Hanger,* of Indianapolis, for appellant.

*Parr, Parr & Parr,* of Lebanon, *Gardner, Jessup, Harrington & Haworth,* of Richmond, and *Kane, Blaine & Hollowell,* of Indianapolis, for appellee.

DRAPER, P. J.—Action by appellee against appellant for libel. Verdict and judgment for $35,000. Appellant assigns error in overruling its motion for new trial.

The appellee contends the appellant's briefs so contravene the rules of this court that no question is presented. The construction of appellant's briefs is such that reference to any one brief in this case requires constant and laborious reference to each of four others. We nevertheless feel that appellant has made a good-faith effort to present the matter according to the rules governing appellate procedure, and we therefore consider the case on its merits.

The parties, both Indiana corporations, were competitors in the manufacture and sale of bus bodies throughout the United States. Appellant distributed its product through seven independent regional administrators, who in turn distributed to dealers and others through about 50 distributors and 65 distribution points, this system covering the entire field in which the parties were in competition. On the dates therein indicated appellant wrote and distributed to its regional administrators the following letters:

"THE WAYNE WORKS

"Since 1868

"Richmond, Ind., U. S. A.

"Regional Letter No. 46        "June 8, 1940

"Inter Office Correspondence

"TO:   All Regional Administrators

"Subject: Hicks' Manufacturing Difficulties

"For more than a month we have been hearing all sorts of rumors regarding the difficulties of the Hicks Company at Lebanon. Information has reached us that during the past month there have never been more than eight or ten men in the plant, and these have been more or less on maintenance. It is our understanding that they have not been in production for at least that length of time and that they are not in production at the present time.

"We are told that their difficulties have arisen from controversies they have had in connection with the wages and hours act, as well as some labor trouble. They have had an election which was supervised by the National Labor Relations Board, but even following this election (about two weeks ago) production has not been resumed.

"It is our understanding that no commitments have been made for materials for the manufacture of buses for 1940; that no literature covering 1940 equipment has been prepared, and that the only thing that has been accomplished is the manufacture of two demonstrators and the issuance of a price schedule.

"We have had no definite confirmation of the infor-

mation given above. It has been received here in a variety of ways and over a considerable period. All of these rumors and reports are in agreement as to statements above.

"We felt that this was information that might readily affect the interests of your distributors, and, accordingly, we pass it on to you for your further use and distribution as you see fit. You will appreciate that we would prefer not issuing a general letter regarding this. You, however, are at liberty to use it in any manner that may benefit you or your field organization.

"Cordially yours,
"WAYNE WORKS,
"J. W. Gayle,
"Sales Manager.

"JWGayle:ee"

"THE WAYNE WORKS
"Since 1868

"Richmond, Ind., U. S. A.
"Regional Letter No. 47        "June 19, 1940
"Inter Office Correspondence
"TO:   All Regional Administrators
"Subject:   Status of Hicks Body Company

"Ed Herrmann, of Indianapolis, has very kindly given me a report on the Hicks Body Company as of last Sunday afternoon. I quote from his letter as follows:

" 'After learning last week that Hicks had resumed operations, I drove over to Lebanon Sunday afternoon and did all the snooping I could.

" 'I counted 54 International Trucks in the parking lot waiting for body installations. Note, please, I say International. There is not a Ford, Chevrolet, Dodge or anything else on the place. According to the four Hicks men who are working in our plant, Earl Hicks, in an attempt to resume operations, is advising his shop men that he has an order from International for 500 bodies (no doubt subject to a lot of discounting) for delivery to Texas. These chassis may be part of such an order. I could not get close enough to them to read

the tags. I might suggest that you have Phil and Jim Hudson check into this, because from what I observe Hicks will be a long time getting these jobs completed. I did not see any finished assembled bodies at either of his plants, and it seems to be a foregone conclusion that Hicks will get nowhere this year.

" 'I was informed by a local source in Lebanon that Hicks succeeded in putting 12 men back on the job last week. I was told that two trailer loads of sheet steel were in Lebanon held for delivery until cash to cover the C.O.D. terms was produced. I can well understand that his vendors would place him on a C.O.D. basis, because his funds will not permit him to meet a "shut down" situation very long.

" 'I noticed the large press delivered to Lebanon last fall is still outdoors in the yard and has never been set up for operation. All in all, it's a sad picture for Hicks.

" 'One more thing, June, I was advised by a filling station attendant across the road from Hicks Plant No. 2 that Bishop & Bishop, from Ohio (he could not recall the town), had taken delivery Saturday on one Hicks job. This dealer has an order with Hicks for five, and he was given no assurance that he would get more than one. Sorry I could not get the town or the make of chassis, but maybe Dick Stanley or one of the other Ohio distributors can run this down and resurrect the deal for Wayne.

" 'If I get any further news I will advise you promptly.'

"All in all it looks as though the Hicks Company would have an extremely difficult time in developing any sales volume during the current year. So far as we can learn, they do not have any literature issued. Price lists have been released for several months. The literature itself has not been in evidence—at least, we haven't received any copies.

"If they are now beginning to start their manufacturing program, we feel it is utterly impossible for them to build—even at their fastest manufacturing

rate—as much as a fraction of the number manufactured last year. It doesn't seem humanly possible that they could start production at this late time and accomplish very much. If so, that means that you and your distributors have the opportunity for an even closer cooperation with International and that you further have an even greater potential for bus sales that will be well worth your careful and aggressive cultivation.

"Please do not quote this letter verbatim, although this information contained in it is at your disposal for distribution to the distributors in your region.

"As further reports are received, we will advise you.

"Cordially yours,
"WAYNE WORKS,
"J. W. Gayle,
"Sales Manager.

"JWGayle:ee"

It is alleged that these letters were written and published with the intent and design that they should be repeated and circulated, and that said letters and their contents were circulated by said regional administrators, their agents, representatives and employees to various named persons at stated times and in certain portions of the United States, "and to many and divers other persons, boards and prospective purchasers not at this time known with certainty to plaintiff but known to the defendant and, therefore, not alleged. . . . That by reason of such circulation and publication by the defendant the contents of said letters became the subject of rumor and trade-talk injurious to the plaintiff in the trade throughout the United States of America, . . . That said publication irreparably damaged the credit, business reputation, trade, custom and business of the plaintiff throughout the United States of America . . ." That each of the statements contained in said letters were false and injuri-

ous in and of themselves to said appellee and its business reputation, trade, credit, custom and business, and the appellee prayed for a recovery of general damages, no specific damages being alleged.

The evidence, including the letters themselves, shows they were written and mailed with the intention that their contents should be further circulated. The financial standing of the appellee was in fact good. It was not in financial difficulties. It had never actually suspended operation of its plant. It had made its commitments for materials for further production, had obtained its literature for 1940 in April, 1940, which was somewhat later than usual, and was able to and did fill all of the orders received by it in that year.

The letters complained of, imputing as they do that this corporate appellee was in serious financial difficulties, lacked credit, had practically suspended operations, was out of production, had made no commitments for materials for further production and would be unable to fill its orders were, to the extent that they were false, libelous *per se*, and will support an action for libel without allegation or proof of special damage. *Maytag Co.* v. *Meadows Mfg. Co.* (1931), 45 F. (2d) 299; *N. Y. Societies, etc.* v. *McFadden Publications, et al.* (1932), 260 N. Y. 167, 183 N. E. 284, 86 A. L. R. 440. The injurious character of language libelous *per se* is a fact of common knowledge of which the courts take judicial notice, and general damages are presumed to result from their publication. *Tracy v. Hacket* (1898), 19 Ind. App. 133, 49 N. E. 185.

The appellant contends it can have no responsibility in this case beyond that incurred by its own publica-

tion of the letters to its regional administrators. Whether one should be held responsible for the voluntary and unauthorized repetition of a libel is here immaterial and is not considered. The appellant suggested and expressly authorized the use, distribution and further circulation of the information contained in the letters, and the natural and probable consequence of such conduct was the repetition, circulation and dissemination of that information, particularly to those persons and in those localities which would be likely to injure the appellee the most. Under such circumstances the appellant is liable for the repetition, circulation and dissemination of the libelous misinformation. 36 C. J., Libel and Slander, p. 1230, § 188.

The appellant asserts that proof of the appellant's publication and circulation of the libel, admissible under the amended complaint upon which the trial was had, should have been limited and restricted to the specific allegations thereof as to the times, places and persons by whom and to whom the libel had been circulated, because it says, the amended complaint was so drafted as to conform to the rulings of the court on certain preliminary motions addressed to the original complaint, which rulings would require the evidence to be confined to such specific allegations. Without any intimation as to the merits of this contention, it is sufficient to say that it presents no question, for neither the original complaint, the motions addressed to it nor the rulings of the court thereon are included in the record before us. Our knowledge of the proceedings and judgment in the court below is derived from the duly authenticated transcript, and we are not permitted to go outside the record for such information. *Jenkins* v. *Steele* (1913), 55 Ind. App. 11, 102 N. E. 139, 103 N. E. 365.

The appellant filed a special answer admitting the mailing of the letters to its regional administrators and alleging the same were true, and it complains of the refusal of the court to permit one Richardson, on direct examination, over appellee's objection, to answer a question which sought to elicit from the witness whether a truck driver who was waiting in front of appellee's plant with two loads of steel for delivery to the appellee, told him that he was waiting to unload until they got their money. The question was objected to on the ground that the evidence would be purely hearsay and the appellant offered to prove that the witness if permitted to answer would answer the question in the affirmative. Hearsay evidence has been defined as the testimony of a witness relative to the declaration of another for the purpose of proving the facts asserted by the declarant. *Griffith, Exr.* v. *Thrall, Admr.* (1941), 109 Ind. App. 141, 29 N. E. (2d) 345. Neither the situation of Richardson or the driver of the truck, nor the circumstances surrounding the making of the declaration were such as to remove the statement from the rule against hearsay. The evidence was not competent to prove that the shipment of steel was actually C.O.D.

The appellant complains of the introduction of certain evidence over its objection and the overruling of its motions to strike it out. There was much of this evidence, testified to by many witnesses, and in the interest of time and space it will be consolidated. They were permitted to testify that general rumors detrimental to appellee's financial condition and integrity were afloat about the country after June 19, 1940; that it was rumored the appellee was broke; its plant was boarded up; it was out of business; it was unable to deliver anything that was sold; no new Hicks bodies

were coming out and other like rumors. Many of these witnesses were permitted to testify as to the time when, the place where and the persons from whom they heard specific remarks such as the foregoing and others to the effect that they were told at a certain time and place by named dealers, township trustees, competitors and others that the one speaking would not buy Hicks bodies for fear of non-delivery; that appellee was on a C.O.D. basis; they were sorry appellee was broke and out of business; it was useless to show or purchase Hicks bodies because appellee couldn't deliver; delivery bonds should be required, and the like. These reports were testified to as coming from various localities in a great many of the New England, the middle western, the western and the southern states, and they resulted in the loss of sales of appellee's product.

The foregoing testimony was objected to for the reason that such testimony amounted to proof of circulation of rumors by persons, to persons, at times and places not alleged in appellee's complaint as those by and to whom and in what places and at what times the libel was republished, and that the appellee was therefore surprised and had no opportunity to prepare its defense against such testimony.

If the appellant deemed the allegations of the amended complaint or any of them to be so indefinite, uncertain or general that it could not safely go to trial under the pleading, it should have tested the questioned allegations by a motion to make more specific. *Watson's Revision of Works Practice,* Vol. 1, p. 568, *et seq.* None was filed. Under its general allegations it was proper to admit evidence of the publication and circulation of the libelous language by appellant to persons, in places and at times not specifically alleged. The unchallenged general allegations of the

amended complaint were ample warning that the appellee intended to produce such proof.

It is asserted the foregoing evidence was hearsay, and therefore inadmissible. It was not properly admissible for the purpose of proving the truthfulness of the facts asserted by the statements, and was not offered for that purpose, for the appellee at all times asserted their falsity, but it was admissible to show that the statements themselves were made, *Wigmore's Code of Evidence* (2d Ed.), § 1317, p. 261; 20 Am. Jur., § 457, p. 404, for it tended to show the extent of the circulation of the rumors and consequent damage to appellee, for which, as we have already said, the appellant was liable. The instructions given by the court are not complained of and are not before us, and we must assume that they properly limited the application of the evidence complained of. *Metropolitan Life Ins. Co.* v. *Fidelity Trust Co., Gdn.* (1938), 214 Ind. 134, 14 N. E. (2d) 911.

The appellant objected to the foregoing testimony as given by several witnesses, for the asserted reason that no connection was shown between such rumors and the publication of the letters, it being appellant's contention that such rumors were in general circulation before and independent of their publication. The evidence in that regard discloses that early in 1940 and for some time prior thereto the appellee had been plagued by labor troubles. Three different Unions were contending for recognition, and a labor board hearing was held in March 1940, and an election in the following May. Although the plant suspended operations only on the day of the election, these labor difficulties seriously impeded production, employment was reduced, and this was a matter of common knowledge and discussion in the community, and re-

ceived recognition in several advertisements in the local daily paper. As a consequence of the slowing down of production appellee's dealers throughout the country were concerned and were making inquiries about their demonstrators and were seeking assurances of appellee's ability to deliver.

While the publisher of a libel cannot justify himself upon the ground that the libelous matter was previously published by another, he is not liable for the results of such publication by another unless he also made it or participated in making it, for he is liable only for the results of his own wrongdoing. *Sourbier* v. *Brown* (1919), 188 Ind. 554, 123 N. E. 802.

*Kersting* v. *White* (1904), St. Louis Court of Appeals, 80 S. W. 730, was a slander case wherein general rumors independent of those circulated by the defendant were afloat, and there was no showing that a certain family had heard the rumors circulated by the defendant and had changed their attitude toward the plaintiff on account thereof. It was held error to present proof of a changed attitude of that family toward the plaintiff since it amounted to a holding that the defendant was responsible for the conduct of other people which he may have had nothing to do with. The same court in the later case of *Burrows* v. *Pulitzer Pub. Co.* (1923), St. Louis Court of Appeals, 255 S. W. 925, a libel case, held that similar proof was admissible, since from the evidence in that case an inference could be drawn that the attitude of such third persons was caused by the publication of the article in question. In the still later case of *Warren* v. *Pulitzer Pub. Co.* (1934), Supreme Court of Missouri, Div. No. 1, 78 S. W. (2d) 404, it is held "proper to show that, after publication of a libel, people who formerly were friendly

with the one libeled had changed their attitude toward him, where it is shown that they read or were informed of it or even that it had been circulated in their neighborhood or community to such an extent that it would be a reasonable inference that they did know of it, and where it is shown or is a reasonable inference that the reading of the article caused the change in attitude." The principle announced commends itself to our judgment, for as said in *Olmsted* v. *Brown* (1852), 12 Barb. 657: "It is a rule equally consistent with good sense, good logic, and good law that a person who would recover damages for an injury occasioned by the conduct of another must show, as an essential part of his case, the relation of the cause and effect."

In this case there was evidence from which the jury could find, or reasonably infer, that the conduct of the appellant was responsible for the great bulk of the circulation of the rumors as shown by the evidence. There were, however, a few instances where, in our opinion, such connection was not expressly shown. The appellant objected to it and after it was admitted moved that it be stricken out, and we therefore examine it with great care to determine whether the evidence would fairly support an inference that these rumors reached these witnesses as the result of their circulation by appellant.

We find that the evidence objected to was given in answer to questions which inquired concerning rumors afloat with regard to appellee's financial condition and standing. These witnesses all testified that they had heard such rumors and some of them added that they had heard the appellee was out of production, could not deliver orders and the like.

The evidence in this case discloses no rumors independent of the letters that the appellee was in financial

difficulties, lacked credit or was on a C.O.D. basis, nor that they were "shut down" or entirely out of production. So far as these rumors were concerned they had their inception with the appellant. Although appellant's letters purport to quote rumors concerning the appellee's financial condition, there is no evidence that such rumors were afloat aside from and independent of appellant's letters. Where, as in this case the evidence shows that a libel has originated with a party and there is further evidence of such a wide circulation of it by him, as to make it difficult if not impossible to trace the ramifications of it and he has expressly authorized the circulation of it, and evidence of the circulation of it soon after its publication appears among those who might be reasonably expected to hear of it as the result of defendant's authorization, we are of the opinion that it is fairly inferable that those who heard it did so as the result of the origination and circulation of it by the original publisher. After careful consideration we are further of the opinion that to the small extent that rumors other than financial crept into the answers of these witnesses, it could not, considering the great bulk of such evidence otherwise properly admitted, have affected the verdict of the jury, particularly when we assume, as we must that the case in its entirety, including truth as a defense, was submitted upon proper instructions to the jury.

The appellant complains that the damages awarded by the jury were excessive. The amount of damages to be recovered in this case was peculiarly · a matter for the jury. There is no fixed or mathamatical rule upon the subject. The general nature and extent of the appellee's business and the damage likely to result from the wrongful act of the appellant were properly to be considered. *Maytag Co.* v.

*Meadows Mfg. Co. supra.* The evidence on the subject of damages was voluminous and further than has been incidentally done will not be detailed in this opinion. It disclosed substantial injuries which called for a substantial recovery. It was shown among other things that for several years the appellee's gross sales had increased each year until 1940 when they decreased about $240,000 from 1939, and in 1941 they were approximately $160,000 less than 1939. Whether such a falling off in the gross business of the appellee was attributable in whole or in part to other factors as claimed by the appellant was for the jury to determine from the conflicting evidence. The jury's verdict met with the approval of the trial court, and the judgment cannot be reversed on account of excessive damages unless the amount appears at first blush to be grossly excessive. *Crocker* v. *Hadley* (1885), 102 Ind. 416, 1 N. E. 734. Such is not the case here. On the contrary, considering all of the evidence and having in mind that the appellee is entitled to recover only for its pecuniary losses, we are convinced that the award is not excessive as to any amount.

There then remains the question of newly discovered evidence. A witness for appellee testified that a certain township trustee told him he had bought three Hicks bodies and three of another make, although he preferred to buy six Hicks, because he was afraid to put all his eggs in one basket, and from all reports, Hicks would be unable to deliver. To support its motion for new trial on account of newly discovered evidence, appellant produces the trustee's affidavit, which recites that *"to the best of his knowledge* he never stated to appellant's witness that he heard the Hicks Company was broke and would be unable to deliver, and he *has no recollection* of hearing such in

1940 and no such report affected his purchase of school busses." (Our emphasis.)

The rules to be applied in considering a motion for new trial on this ground are stated in *State Storage, Inc.* v. *Scheper* (1932), 95 Ind. App. 157, 164, 181 N. E. 385. Since the evidence under consideration is equivocal and indecisive and would not, in our opinion, render it reasonably certain that another trial would bring a different result, other aspects of the showing need not be considered.

Judgment affirmed.

NOTE.—Reported in 55 N. E. (2d) 382.